Thank you, Your Honor. May it please the Court. I'm Ron Schuetz, counsel for I-Mation. I'll be arguing on behalf of all the appellants today. The District Court's decision should be reversed for two reasons. First, the cross-license agreement between the parties is a present grant of a license to existing entities and entities contemplated to be created in the cross-license agreement. Point number two, there is no temporal restriction on the creation of these new entities in either the license grant itself or the definition of the term subsidiary in the cross-license agreement. What the District Court did, of course, in committing error, was to take the phrase in the definitions of a subsidiary, which is either now or hereafter, and rewriting it to say now or hereafter, to really be from now until March 1, 2000. And in the procedural context of this case, that was clearly error. This was a 12C motion for judgment on the pleadings, so the Court had to find and reach this decision that the term now or hereafter was unambiguous, but yet somehow meant now or hereafter, but only up until March 1, 2000. Clearly an error. The Court could not do that. So the relief we request today is that the Court find that the agreement is in fact unambiguous the way that the appellants think the agreement should be read, which is according to its plain language, that subsidiaries in fact created now or hereafter at any time during the term of the license, which is coextensive with the last patent, are covered under this agreement. And in looking at this case, there are half a dozen key points, I think, that will be very instructive to the Court in looking at and interpreting this agreement according to its plain meaning. Again, first, the definition of subsidiary explicitly incorporates future unknown entities, and it does so by using the phrase now or hereafter. Again, the definition of subsidiary contains no temporal limitation. Third, the license grant uses explicit, clear language, again, of a present grant of rights to subsidiaries, and those are existing subsidiaries and subsidiaries that were unknown at the time but could be created in the future. There is no possibility that a subsidiary acquired or created prior to March 2000 would have a license automatically with no effort, no requirements of any actions on the part of either Imation, by giving notice of some kind, or on the part of Phillips by actually writing a letter, giving notice, or saying anything. The license grant is broad. It says agreed to and in fact hereby grant a license to. Nothing else is required. So there's no dispute that prior to March 2000, Imation could have created 10,000 subsidiaries, 10,000, all unknown, uncontemplated, with no action required on the part of either party. Phillips also likes to make, every time they get the chance, they did it in this case and they do it below, claiming that somehow what Imation has done here has violated the spirit of the agreement by cutting off royalties and license fees that Phillips would otherwise have gotten but for the structure and nature of this transaction. A couple of important points to keep in mind here with respect to that. First, this agreement was between two very sophisticated, large, multinational corporations. We're not simply here arguing this is an agreement. Nonetheless, they didn't manage to come up with a contract that was easy to root to. Your Honor, I think they did come up with a contract that was easy to root to. Both of you do, but you don't agree on what that understanding is, which is a pretty good indication that neither of you is necessarily fully correct. Now you said something which I thought was quite interesting. You said after 2000, they could no longer set up subsidiaries? No. If I said that, I misspoke. I said prior to March 1, 2000, there is no dispute by anybody that we could have set up 10,000 subsidiaries. That's not in dispute. The only dispute, of course, is when, if ever, is there a cutoff time on the ability to set up subsidiaries. And the point I'm trying to make is that the point after 2000 would restrict the establishment of a subsequent subsidiary. That's right. It clearly does not, because all you need to do is go to the definition of subsidiary in Article I, and it's very clear. I misunderstood what you had said before then. But to drive that point home, and I really think it's important to rebut this argument that somehow what we've done is a violation of the spirit of the agreement, or we've taken away Phillips' ability to There's no dispute that we're a successor and the party in interest now. But three, multinational, large corporations, very sophisticated, both of whom had competing technologies. So this agreement is a royalty-free cross-license like many that this Court has seen in the past. You've got these two entities out there in the marketplace. They're not sure whose technology is actually going to win in the marketplace, so they each hedged their bets. They each hedged their bets by granting these royalty-free cross-licenses. And in hedging their bets, they granted very broad rights, very broad cross-license rights, very broad have-made rights, very broad rights on the definition of subsidiaries with no temporal limitation of when they can be created. Again, these companies operate around the world, they form subsidiaries, they make acquisitions, they spin things off. So for Phillips to say we're somehow taking advantage of this license agreement, no. They negotiated the same benefit to them if the shoe had been on the other foot. We could have on February 28, 2000, one day before the expiration date in the contract, we could have gone out and purchased a 51% interest in every single entity that was Now there's no dispute, in our view, that we could have done that on March 2, 2000. I take it you would, maybe I'm asking the wrong party here, but your understanding of Phillips' position is that it would be okay if you created these 10,000 subsidiaries and they just sat there as shell corporations for five years and then you suddenly had them begin selling products that incorporated the licensed patents. Even under Phillips' definition, we could do that. That's what my question was. That's your understanding of what Phillips' position is. The difference is, in their view, you can't come in later and create an entity, a new entity, that fits the definition of subsidiary but for the time. Right, and they get there by arguing that the expiration clause should be read into and be a restriction on the term now or hereafter. We would respectfully submit that, especially in the procedural context here, it's just simply improper to rule as a matter of law that now or hereafter is unambiguous, but what it really means is now up until March 1, 2000. You simply can't reach that result. We don't think, with a straight face and claim, that's unambiguous. Well, it isn't unknown for contracts to have language that is theoretically broad enough to go on forever but is understood to be confined to the contract. I mean, it's a collective bargaining agreement. It's a perfect example. Typically, a collective bargaining agreement, let's suppose it's a five-year collective bargaining agreement, and one provision of the agreement says the employees shall continue to get a 10% raise each year, period. Well, after the agreement expires, they don't continue to get a 10% increase each year. Their rights are defined by the scope of the agreement, and anything which looks like it might otherwise go on forever is understood to be limited to the scope of the agreement. The question is, why isn't that true here? Well, the license itself is in fact limited by this agreement, and the license is limited because it's tied to licensed products and licensed patents. Yeah, yeah, but why isn't the hereafter understood to be hereafter within the confines of the agreement? There's only one way that you could possibly do that, and that's by incorporating the temporal restriction, which is explicitly, by the way, explicitly incorporated in the definition of licensed patents. The definition of licensed patents includes a reference to the expiration date, and it's clear again, we believe that the reason that is in there is to cut off the patent pool. In other words, again, these large companies had agreed that for a five-year period, in essence, as And so there in fact is a limit on the time that these companies have these cross-license rights, and it's operated by a cut-off of the licensed patent pool. And again, sophisticated companies, where they know how to specifically use a date cut-off, they did it in the definition of licensed patents, chose not to do it when they were talking about the creation of subsidiaries. Not only did they choose not to do it, they used this broad, expansive language. Not subsidiaries now, not existing subsidiaries, current subsidiaries, but subsidiaries created now or hereafter. Now, there is an extension under the terms of the license for patents that do not expire on that specific date. Are there many patents that still don't exist? There are currently, and I'm glad Your Honor raised this, because it shows the real-world implication of this case. There are eight patents in suit. One of them is not covered by this agreement. One is outside the scope of this agreement, simply because it has a priority date that is defense in this case, to seven of the eight patents. And the eighth patent is not part of this record, we don't believe is infringed. And Phillips has taken this decision out of the district court, and although they did not disclose this in their papers, we disclosed it in ours. There's litigation in a couple of other courts around the world involving this, and those foreign courts are looking at this decision. Phillips has made a lot about the fact that they got the court in Minnesota to find that this agreement cut off the ability for I-Nation to argue that Memorex and GDM. So it has huge impact around the world, which is, I believe, one of the reasons that Judge Frank granted the 54B to get this up here and get a final decision here. I see I'm in my rebuttal time, so unless there's anything else at this point, I'll... I'll hear from you on the rebuttal then, and in the meantime, we'll hear from Mr. DeLue. A few words. May it please the Court. What is the correct pronunciation of your name? DeLue. DeLue? DeLue. Thank you very much, Judge Bryson. May it please the Court, Mark DeLue, counsel for Phillips, the appellees. This appeal concerns a straightforward matter of contract interpretation under New York law. The district court heard from the parties after extensive briefing, actually, on two different motions, an oral argument extensively interpreting the contract here at issue, and it determined, based on two alternative grounds, that new licensees could not be granted after the expiration of the contract in both of those grounds were correct, and either one of which would be sufficient for affirmance. Now, counsel for Imatien spent all of his time on the second ground, the definition of subsidiary. For the reasons Judge Bryson, you pointed out, the district court got it right to say the word subsidiary should be defined with reference to the term of the agreement. Doesn't the inclusion of the temporal limitation that's set forth in Article 4, and it's specifically referenced in Section 12.3, show that these sophisticated parties knew how to use it when they wanted to in definitions, and go completely contrary to your argument with respect to Section 13? Respectfully, Judge, no, I don't believe so. Isn't that a basic canon of statutory construction, that if the parties know how to use it, they use it, and if they don't use it, they intentionally don't intend to? Sure. We've got a situation where there are lots of basic canons running up against each other. It's also a basic canon of contract interpretation, that terms are construed with reference to the term of the agreement. That's why the comment that Judge Bryson made about a collective bargaining agreement is true. There's a lot of case law we've cited. If that's true, then why would you include it, the specific term, in the language of Section 12.3? Doesn't that run counter to that statutory construction as well? No, because 12.3 actually has to have a specific date, whereas 12.1 and the definition of subsidiary do not need to have specific dates. What about 12.2? Excuse me? What about 12.2? If I'm getting this wrong, I think it was 12.1 and then subsidiary. 12.1 and 12.2, neither one has a specific date. Right. And I'm not sure how you distinguish 12.2 from 12.3. Licensed patents can be owned or controlled throughout the time period. The priority date cutoff was March 1, 2000. But respectfully, if I could, Your Honor, because what I really wanted to do was shift to the first ground of the district court's decision. If you could answer the question, though, about that you were going to, and I interrupted you. The point is that there needs to be a strict cutoff for priority dates. March 1, 2000, cutoff for priority dates. Now, if I'm asking and Moser-Baer's construction were correct, there needs to be no reason for there to be an expiration clause at all. Because the only use of the expiration clause in the contract would be to operate as a definition for 12.3. And the words, expiration of this agreement, which is the title of Article 4, would mean nothing. And the words, the term of this agreement, also would mean nothing. And that's where I get to my first point about Article 4. This is the first ground for the district court's decision. The district court said, looked at this language. The term of this agreement shall expire on March 1, 2000. The only exception is for licenses that have been granted prior to that date. And I mentioned that Moser-Baer agreed that GDM and Memorex did not have a license prior to March 1, 2000. And so the district court said that point's dispositive. GDM and Memorex never had a license before March 1, 2000. And so they can't have a license thereafter. The language of Article 4 is only licenses which have been granted under Article 2 before the expiration date. Why would GDM and Memorex fall under the subsidiary clause? Well, even if they do, that's why it's a second ground. Even if GDM and Memorex do fall into the subsidiary, those two entities did not get a license as of March 1, 2000. Because they didn't exist. Didn't even exist. If they had existed on February 29, 2000. And they were affiliated with Imation. Well, they were created by Imation on February 29, 2000. Then the creation would automatically give them the license per, by the force of the contract, right? On that date, correct. So what happened was here is, it's not the question, the second issue is whether they qualify as subsidiaries. But even assuming for the moment they qualify as subsidiaries, they didn't get a license prior to March 1, 2000. So pursuant to this clause, Article 4 says, only licenses that were granted prior to March 1, 2000 shall continue thereafter. And now, the only argument that appellants make now in response to that, it's a clear line of logic from the district court is, well, these licenses weren't personal to the individual entities. This was a single group license to Imation and all of its subsidiaries all together. A collective group license. And the district court and the reasons we've set forth in our brief all make this incorrect. The first- But don't your arguments front counter, in making your personal argument at page 39 of your brief, you rely on a 1948 Eighth Circuit case. Don't the line of cases from the federal circuit within the past few years make that personal distinction really what Imation is arguing? A difference between personal interest versus property interest and not something else that you're trying to give it? No, first of all, there's many different decisions, all of which, I think there was a decision last year, which says licenses are ordinarily personal and non-transferable in the absence of any language to the contrary. That's the usual way that this issue comes up. Let's say one entity wants to transfer it to another entity and they say, no, no, it's a personal and non-transferable right. But it also comes up in this situation where an individual dies and the estate wants to have that license passed on. In either situation, the reason that this court and other courts have said that the license can't be passed on is it's a personal right to that individual licensee. And Imation, in Moser-Behr's argument, would say personal means the same as non-transferable. Well, again, that would run up against the canon of construction. The license grant itself says that the licenses are personal and non-transferable. And so if personal means the same as non-transferable, then you've rendered one of those two words superfluous. And Imation says in their brief that that is an unacceptable interpretation under New York law. New York law requires that you give meaning to every single provision. But even putting aside the issue of personal, just to go back to Article IV for a second, Article IV says only licenses that have been granted prior to March 1, 2000 shall continue thereafter. It's undisputed that GDM and Memorex did not have a license as of February 29th of 2000. And so therefore, they couldn't have had a license that continued thereafter. And Imation agreed before the district court that the licenses are to individual licensees. They said before the district court GDM and Memorex are directly licensed under the CLA. Rather than indirectly licensed through Imation. And Moser Bear recognized that Imation and Phillips agreed that subsidiaries are directly, i.e. individually licensed. In other words, GDM and Memorex are getting a license on their own. Not through some Imation group. And that's consistent with all the language of the contract. And I'll pass it to the third board. Why wouldn't that just be... Before we get to that point, you're not saying that the original license that 3M transferred to Imation was improper. No, no, that was an assignment. That was an assignment. Over 1996. Correct. And you're not challenging that. The parties have stipulated that Imation succeeded to 3M's rights. That's correct. And now we're looking at the next tier of subsidiaries for Imation. What we're looking at is purported subsidiaries that were created after March 1, 2000. So they didn't have a license as of March 1, 2000 when the contract terminated. Except for the continuation of the patents which were still in existence at that point in time. For Imation and its pre-existing subsidiaries. There was no license to GDM. GDM wasn't even a sparkle in Imation's eyes as of the expiration of this agreement. It only came into being in 2003. Memorex was only acquired by Imation in 2006. So as of that, as of March 1, 2000, when the contract expired... Well, the contract didn't expire. Let's go back forward, though. Did it expire or the license continued for the unexpired patents? Both. The contract expired according to this. This is the article that makes all the difference. Article 4 says, expiration of this agreement. And it says, the term of this agreement shall expire on March 1, 2000. Except, and the exception is the only provision pursuant to which any party, any entity, can ever have a license. Otherwise, the contract's terminated. It's like the collective bargaining example. Except that any patent license that has been granted under Article 2 shall continue thereafter with a term provided in Article 3. Correct. And that's where you get into your question. Imation had a license. So Imation's license could continue for all of those licensed patents. For the patents that are still in existence. Correct, subject to other issues. And then other existing subsidiaries that already had a license could have that continuing license. But as to entities that had not even come into being as of March 1, 2000, they didn't have a license. GDM did not have a license. And there is no argument otherwise. That's why the district court said, well, GDM and Memorex didn't have a license on March 1, 2000. They didn't have a license on March 2, 2000. So they can't have a license that, as Article 4 says, shall continue thereafter. But the license does continue after 2000. For Imation. For those patents, for Imation. And Imation still has the right, as I understand it, to establish subsidiaries under the license. Well, Imation has the right to establish subsidiaries. The question is whether those subsidiaries are licensed. And the answer to that question is totally found in Article 4. Only patent licenses which have been granted prior to March 1, 2000 may continue thereafter. There is no right of sub-licensing or assignment for Imation to give after March 1, 2000. Didn't they step into the shoes of 3M? They did. Well, they succeeded to 3M. But Imation doesn't have a right to sub-license to new subsidiaries. The licenses are granted pursuant to Article 2, Section 2 of the amendment. What about Section 13? Section 13 is a definitional clause. Again, for purposes of the first grounds that the District Court reached, you can assume that GDM and Memorex qualify as subsidiaries. Let's just assume that they do. Again, I don't think they do for the reason Judge Bryson and the District Court both said, because you refer to language with temporal scope during the term of the agreement. But let's just assume that GDM and Memorex are subsidiaries within that definition. The question is, did GDM and Memorex have a license on March 1, 2000? That's the dispositive question, as the District Court correctly found, because Article 4 says, only licenses which have been granted as of March 1, 2000, shall continue thereafter. But let's step back for a second, because the license still continues for those patents that are in existence. For those licensees, yes. For those licensees. Right. So those licensees would have the right to set up subsidiaries under the license. No, no. Why not? The contract does not give them that right. The contract says specifically, in many different places, that all of the licenses are personal, non-transferable, non-assignable. Both in Article 2, Section 2, and then in Article 9, Section 6, it says the licenses herein are personal and may not be assigned, sub-licenses, or otherwise transferred without agreement of the other party. So even a purchase of all the assets of Imation would not have the effect of transferring the license to the purchasing entity? That's the one exception. If there's all of the business, that's the 3M to Imation exception. During the term of the agreement, Imation spun off of 3M. After 2000, if Imation should be purchased by another corporation, all the assets are purchased, would that have the effect of transferring to that corporation Imation's rights and licenses? That's right. That is the exception under Article 9. Even after the... Even after that. This is not an issue of Article 9, Section 6. Imation succeeded to 3M's licenses, and if Imation were to cease to do business and spin off into a different company, that clause would allow it to do so. It could be a total stock sale or a total asset sale. It wouldn't make any difference. As long as the new business acquired substantially all of the business of Imation, then I believe... This is not an issue that's ever been presented in the case, but that's what I believe would occur. But what it does say in that provision is Imation can't sub-license. It can't assign. It can't transfer even to subsidiaries. So the question is, did GDM and Memorex have a license on March 1, 2000? Doesn't the agrees-to-grant language in Section 2, where Phillips is agreeing to grant to 3M and its subsidiaries, give 3M and ultimately Imation here a present grant of rights as well as any of their subsidiaries when you look back at Section 13 that are created then or hereafter? Well, what it does, first of all, you can't give in 1995 a present grant of rights to an entity that doesn't exist. And remember, Imation... Sure you can, under Federal Circuit law. No, no, you can't. Yes, you can. Under law that this circuit has held, that language, agrees-to-grant, can apply very clearly to future grants. Well, that's exactly what it's going to say. The Film Tech decision, appellants say that's the leading case on point. I agree. The Film Tech decision had the same language, agrees-to-grant and does hereby grant. And what this Court said in that case was what you do when you sign that agreement with that language is you give at most an expectant interest. At most there's some sort of equitable claim to future inventions. Legal title does not pass upon signing of the agreement. What about this Court's opinion in DDB Tech from 2008 which specifically said it's an express assignment of rights in future inventions? Exactly. And what it says is what happens is that the assignment automatically happens at the time the invention comes into being. Same thing in Film Tech. Film Tech says you don't have a legal right. There's no vested title as of the time you sign that agreement. You only have an expectant interest or at most an equitable claim. But when the invention comes into being, or analogously in this situation, when the subsidiary comes into being, when that happens, at that point you automatically, as a matter of law, get the assignment. And that's our nation's argument. Right, but then what they're missing there is when. Because when is in 2003 for a GDL. When is 2006 for a memoir. It's clear under the Film Tech and DDB decisions that as of the time you sign the contract with the Agrees to Grant and Does Hereby grant, you're not giving a license. All you're doing is giving an expectant interest to an entity. The license, the assignment comes into play when an invention comes into being or when a subsidiary comes into being. So again, GDL was formed in 2003. Memorex formed in 2006. So when could they have received an actual license? Those dates, not before March 1, 2000. And then according to this provision, Article 4, they would not have received a license as of March 1, 2000. And that's confirmed by the language of Article 4 which says any and has been granted. It's not a single license to a single group entity. It's licenses to individual parties. Additional entities may get licenses over time. And through March 1, 2000, as Mr. Schutz pointed out, that would be free. All our nation's subsidiaries created after that time would get licenses. But then Article 4 also says that after that, there are no new licenses that are to be granted. And according to the Film Tech and the DDB technology, even though it would be automatic as a matter of law, at that time, because the license had not been granted as of 2000, March 1, 2000, then therefore you can't have a license in 2003. There is no license to continue thereafter. But the license continues to this day, doesn't it? The I-Nation license does, yes. For those patents which are extended beyond the 2000. Correct. So could I-Nation at that point set up its own subsidiaries pursuant to the agreement? Why not? If the agreement is still in existence, the life of the agreement is still in existence, right? Only for those patents which continue beyond 2000. They still have a license. I-Nation does. Under the terms of that license, what does I-Nation have? I-Nation has a license to those patents, subject, of course, to an issue about material damage. And does it have the right under that license to establish subsidiaries? No. Not to transfer to, you say. You cannot transfer a license to. You certainly can create a subsidiary. But Article 9, Section 6 says that the rights and licenses granted herein are personal and may not be assigned, sub-licensed, or otherwise transferred. And that's the key here. So I-Nation could create a subsidiary, but that new subsidiary wouldn't be allowed to be assigned I-Nation's license. I-Nation has a license. That's only assuming if you read the article for limitation into Section 13, where it does not specifically refer to that.  Respectfully, Your Honor, no. That's not true. This is a second issue. I'm assuming, for purposes of my argument, I don't agree with it. I believe for the reasons the district court said, that subsidiary doesn't include GDM and Memorex. But for purposes of the first ground, even if GDM and Memorex qualify as subsidiaries, the question is, when did they get a license? When could they have received a license? And there's no dispute here that they did not have a license on March 1, 2000. They didn't have a license in February. They didn't have a license in April of 2000. Because they didn't exist. They didn't exist. But that's the only reason. I mean, if they had existed, as a matter of operation of the contract, they would have had a license. Correct. Well, existed and been affiliated with I-Nation. Memorex did exist, but they weren't affiliated with them. But that assumes that the court agrees with your argument that agrees to grant in Section 2 refers to a future grant, and not a present one. I wouldn't say that either, although that's certainly one of the reasons why we explain that the group license theory is just wrong. It violates any number of different provisions. And it's completely a made-up issue on appeal. I-Nation said before the district court there are individual direct licenses to these entities. But again, the issue is, when pursuant to Article 4, these licenses were granted. Licenses are to individual entities. There's a long and consistent line of authority that licenses an individual grant of rights to an individual party. And so the question is, did GDM and Memorex have a license on March 1, 2000? Even if they qualify under the definition of subsidiary, they indisputably did not have a license on March 1, 2000. And therefore, the only provision of the whole contract that could give them a license is Article 4, which says only the licenses that had been granted as of March 1, 2000 can continue thereafter. And so therefore... But your argument would fall apart if Section 2 gives to I-Nation and any subsidiaries that are created hereafter a present license, wouldn't it? If it gave them a present license, I don't know how that would work with respect to a nonexistent entity. Agrees to grant. Well, but again, the Film Tech decision and the DDB Technologies decision both say that most you can have is an expected interest. So what I-Nation had is maybe what some other entities had were at most an expectant interest. And what they did not have as of 1995 was a license. And they didn't have a license because what the contract envisions is that in 1995 there's going to be some licenses that are granted upon signing. Does hereby grant. And then there's going to be additional licenses that are to come over time, which is exactly what the Film Tech and DDB decisions stand for. That over time, new inventions will come into play. In this case, the same thing follows for subsidiaries. Over time, new inventions and new subsidiaries will follow. When those come into being, just as the Film Tech decision said, at the time an invention is made, once an invention came into being, this is page 1572 to 1573 of the Film Tech decision, once an invention came into being, legal title is then passed. So that's when the license is actually vested. Before that, all you have is an equitable interest. That's not to say if the contract expired in 2010, then of course GDM and Memorex, at least under this issue, would clearly have a license. But it expired as of March 1, 2000. So at that time, the most Imation had was an expectant interest with respect to additional subsidiaries. No license had been granted. Let me ask you a question. We've run well over your time, but we've been pestering you pretty heavily with questions. But let me pester you with one more. Backing away from the language for a moment and thinking about what purposes the parties were attempting to achieve here and what the real differences are between the constructions of the contract in practical terms, at least I understand what they are now because they have substantial consequences in the litigation given that the parties have aligned their, or at least the defendants have aligned their businesses in a certain way. But starting off, if both parties had understood the contract the way you say it should be read, how would that have given you more protection in any practical sense than the version of the contract that the appellants are urging? Well, what would have happened was that... This really goes back to Mr. Schutz's 10,000 subsidiaries all of which could be sitting there waiting to start selling products. There's also a lot of authority that this court has adopted and that other courts have recognized around sham licensees. And there's a second question here, I don't really want to get too deep into that, of whether GDM is just a sham. There's a second theory as to why these are not licensed. What happened, what Phillips wanted to avoid and presumably 3M did as well, was to have a situation where after March 1, 2000 these companies could continue to grow the royalty-free world. Now yes, theoretically Imation could have thought on February 29th I'm going to do this by creating all these shell entities and trying to get around the license. And as I say... Why should we run joint ventures through a corporate entity which has the license? Why isn't that good? Well, because there's a whole lot of authority that indicates that if you're just creating a sham, just for the purposes of evading restrictions on a royalty agreement, the Cook decision, the Spindle Fabric decision, they're responsible decisions. But even putting that aside, let's assume that Imation is operating in good faith, as is Phillips. What both parties wanted to do was to cap the ability of the parties to just expand the royalty-free universe. Imation has a royalty-free cross license. And what it tried to do here in 2003 was to partner up with a royalty-paying licensee that was paying millions of dollars of license fees to Phillips. In 2003, Moser Bear was paying millions of dollars to Phillips. And what they did was create this 51% owned by Imation, 49% owned by Moser Bear joint venture on paper that did nothing other than sell Moser Bear's disks for which they had already been paying, or they had been paying a royalty. So instead, Moser Bear should have simply gone to Imation and said, you know, someday Phillips may be making this argument and they may get a district court to buy it. Instead of our creating a new entity, why don't we simply buy a 49% interest in one of your subs? One of your existing subs. That's one thing, if there was such a sub. But what they could have done in 2003, and they did not do, and this actually shows why the corporate form really does matter. In 2003, they could have just said, why don't we just sell all of our products through Imation? I mean, these products often come with brands that are not Moser Bear brand. Many of the disks we all buy in Staples don't come with the Moser Bear brand, although Moser Bear is one of the leading manufacturers of this product. They could have sold this all through Imation and then sold to all the same customers, the Staples, the Home Depot, and all the like, but they didn't. But how would you have been better off if they had elected that course of action? Well, the reason that they didn't do that is because there's meaning to the corporate form. Customers don't want to have their only supplier be Imation. They want to have a variety of different suppliers. And GDM, the joint venture that was created by Imation and Moser Bear, that's Moser Bear. The customers, Staples or some other customer that buys disks from GDM, they believe that their supplier is Moser Bear. But doesn't Imation have a majority interest in it? They do, but these are... But it's Imation. Well, but all that happens is that the same disks that were being sold by Moser Bear to their customers are now being sold through GDM. And what happens is Imation just gets a cut. And it's a management fee. This just goes to show on the sham. It's a management fee that's based on a per-disk rate. Well, we all know what that is. And discovery, if it were needed, could show that what that is is it's just a cut of Philips' royalty. So what happened here is they created this joint venture. Moser Bear is continuing to sell all the same products it always sold to the same customers it always had, but now it's selling it through GDM, and Imation gets a cut. And exactly the same thing could have happened and you'd have had nothing to say about it if they'd picked one of the Imation subs that was created on February 29, 2000. They didn't have such an Imation subsidiary. If they did, they would have done it. And the reason they didn't do it... Because they didn't pursue this argument. If they pursued this, they surely would have created such a sub. I'm not sure why they wouldn't have, but in any event, the real reason they didn't was they didn't want to sell through Imation. The customers already were buying a lot of disks from Imation. And they still are. It's just they think it's Moser Bear, even though... They think it's Moser Bear because it really is. Because it really is. The sales force at GDM are the Moser Bear sales people. But it would be true of a sub that was created... They would have had to overcome the resistance of having a supplier that was really Imation. But the key here is... I think there are arguments both ways. Mr. Shute says, well, I can make 10,000 subsidiaries. I could violate the spirit of the agreement by having created 10,000 subsidiaries the day before expiration. Philip says, well, that would be a sham and we'd be able to sue you anyway. But putting that aside, the key issue here is what does the contract say? The contract says only licenses that have been granted prior to March 1, 2000. And GDM and Memorex did not have a license as of March 1, 2000. And therefore, the district court's decision should be affirmed. Thank you very much. One question about counsel. There is some confidential material in your brief and also in the joint appendix. I only found one page to be confidential. Is that correct? Page 1031. I'm just asking this for the purposes of trying to write an opinion on this matter. So what can be used and what can't be used. We're always stuck with this question. Is that basically... This is a draft of the agreement. I don't think... I think these were all... The reasons that all of these were designated is highly confidential. They were produced in discovery by Phillips. And I don't think any of these should pose a problem. I think you can freely cite them. Both sides waive any objection? You would waive any objection? Anything that appears in the materials? Yes. Thank you very much. Very well. We have Mr. Schutz. Mr. Schutz, we gave Mr. DeLue quite a bit of additional time. So if you need to run over your rebuttal time a bit, you go ahead. Thank you, Your Honor. Mr. Schwiebert, would you be so kind as to pull the board right behind that one? Just pull that one off. To quote from the movie My Cousin Vinnie Not, this says in the second bullet point, Moser Bear says, I, Mason, and Phillips agree that subsidiaries are directly, i.e., individually licensed. Appendix 1535. It's made up out of whole cloth. At 1535 in the appendix is Roger Milgram's expert report. Paragraph 20 of Mr. Milgram's report is reiterating what the district court said. Nobody on our side of the table ever said that these are individual licenses as opposed to a group license. In fact, if you go back to Article 2, Section 2, which is the license grant, again, the language is very clear that it is, as I think the court appreciates, a present grant. Not only Film Tech, DDB, Imitech, all those cases clearly show that you can grant rights for things to happen in the future. So what is the license? If you go to Article 4 and you look at the language, except that any patent license which has been granted. So it uses license in the singular, which is very important. Then you have to go back to the license grant to see what that exception encompasses. And in the license grant there are four licenses granted. A license from 3M to Philips to do certain things. A second license from 3M to Philips to practice some process. And the same is true from Philips to 3M, now Imation. So you have these four individual licenses, each of whom are to more than one entity, a group of entities, some of which are known, Imation. Its current subsidiaries that are knowable. And then subsidiaries that can be created now or hereafter. So the definition of Article 4 supports our position here. That license, so you go to the license. What is the license? It's the subsidiaries. And then you go to subsidiaries. It's now or hereafter created. So I think that answers that question. The personal license issue, several cases out of the district courts and this court that merely hold that a personal license means that I can't go out and peddle it to someone else. And it's non-transferable in that section here. So I believe that that is the situation. And quite frankly with that, Your Honors, unless you have any other questions, I don't have anything else to add. Your alternative request is for us to send this back for further proceedings you indicated on summary judgment as opposed to on the pleadings. Is that right? Yes. Do I recall that? I mean, we believe, although... You'd rather win the case outright, but if worse comes to worse, you'd rather go back to the district court on a summary judgment. I mean, of the three possible outcomes, which is it's unambiguous their way, it's unambiguous our way, or it goes back to the district court, we certainly don't find it's unambiguous their way. Well, I'm going with this. What do you think, just categorically speaking, without getting into the details, that you would be able to add to the district court's enlightenment by changing from the on the pleadings ruling to a summary judgment proceeding? Well, we believe that if it were a summary judgment brought by Phillips, we would be able to overcome that and show that we'd get to go to a jury on the issue of what the contract meant at that point. You're talking about parole evidence? Yes. There's extrinsic evidence, parole evidence. Again, this is outside the record, but your honors are familiar with how things work. There are massive document productions that were ongoing at the time this motion was brought, so there were a lot of materials that we had not seen at the time this motion was brought to put in to say, by the way, there's some drafting history. Although there's some drafting history things here that are relevant, including the fact that the now or hereafter language was proposed by Phillips. And given that they proposed that, and of course the court did not consider that because the court just ruled based on the language of the agreement itself and found it unambiguous. But should there be a ruling by this court that our interpretation is maybe you don't buy it for whatever reason and find if there's some ambiguity and it goes back, that's one of the things among many things that we would bring up. But again, our request is that as a matter of law the agreement is unambiguous the way we have suggested it. Thank you very much. Thank you. And I thank both counsel. The case is submitted.